IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| TODD A. MELLON, | ) CIVIL ACTION No. 4:08-2110-MBS-TER | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied.

---

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI alleging disability since January 23, 2004, claiming disability due to human immunodeficiency virus (HIV), anxiety, and depression. (Tr. 51,-53, 66-78, 373-76).  Plaintiff requested a hearing after his claims were denied initially and upon reconsideration.  A hearing was held on October 1, 2007.  The Administrative Law Judge (ALJ) issued a decision on February 27, 2008, finding that Plaintiff was not disabled because he could perform a full range of medium work, including past relevant work as a stock or sales person clerk.

(Tr. 19, 25). As the Appeals Council denied Plaintiff's subsequent request for review of the ALJ's decision, the ALJ's decision became the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g). *See* 20 C.F.R. §§ 404.981, 416.1481.

## II.  FACTUAL BACKGROUND

Plaintiff was born on November 14, 1973, and was 34 years old on the date of the administrative hearing before the ALJ. (Tr. 66).  Plaintiff testified that he has a high school education, which included some special education programs. (Tr. 161).  Plaintiff has past work experience as a dishwasher, hotel houseman, sales clerk, and stock clerk.

## III.  DISABILITY ANALYSIS

Plaintiff's points on appeal consist of the following, quoted verbatim:

1. The Secretary applied an incorrect legal standard by failing to perform a detailed assessment of mental capacities at step four of the sequential evaluation.

2. Substantial evidence does not support the ALJ's conclusion that Mr. Mellon can perform his past relevant work as a stock clerk or sales clerk.

(Pl. Br. at 8, 10).

In the decision of February 27 , 2008, the ALJ found  the following:

1. The claimant met the insured status requirements of the Social Security Act through June 30, 2005.

2. The claimant has not engaged in substantial gainful activity since January 23, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe combination of impairments: HIV, well controlled on anti-viral medications, mood disorder with anxiety and alcohol abuse (20 CFR 404.1520(c) and 416.920 (c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of medium work. The claimant can lift and carry up to 50 pounds occasionally and 25 pounds frequently. He can sit, stand or walk for up to six hours in a workday. He can perform work on a regular schedule with superficial interactions with others and moderately complex tasks.

6.  The claimant is capable of performing past relevant work as a stock clerk or sales person clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in Social Security Act, from January 23, 2004 through the date of this decision (20 CFR  § 404.1520(f) and 416.920(f)).

(Tr. 17-26).

The Commissioner argues that the ALJ's decision was based on substantial evidence and that the phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 390-401 (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the legal conclusions of the Commissioner are correct under controlling

law. *Myers v. Califano*, 611 F.2d 980, 982-83 (4th Cir. 1988); *Richardson v. Califano*, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). However, the inquiry does not end there. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law," *Coffman v. Bowen*, 829 F .2d 514, 517 (4th Cir.1987). The deferential standard of review applied to the agency's findings of fact does not apply to conclusions of law or the application of legal standards or procedural rules by the agency. *Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir.1982)(failure to mention and/or discuss treating physician opinion was failure to apply proper legal standards requiring reversal).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a. An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work, and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 20 C.F.R. § 404.1505(a); *Blalock*, 483 F.2d at 775. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and proper legal standards were applied. *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). A claimant is not disabled within the meaning of the Act if he can return to his past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing the claimant's inability to work within the meaning of the Social Security Act. 42 U.S.C. § 423 (d)(5). The claimant must make a *prima facie* showing of disability by showing that he or she was unable to return to past relevant work. *Grant v. Schweiker*, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id*. at 191.

## IV.  MEDICAL REPORTS

The undersigned has reviewed the medical records in this case and finds many of the reports relevant to the issues in this case. As Plaintiff has not seriously disputed the medical evidence as set out by Defendant in his brief, the medicals will be set forth herein primarily from Defendant's brief.

In October 2003, Plaintiff presented in the emergency department and received treatment for thrush (fungal infection) in his mouth (Tr. 187-94).  Testing later that month confirmed that he was HIV positive (Tr. 195-99), although he said he "sort of knew" before that because his partner had been diagnosed in 2000 (Tr. 20).  In early 2004, he sought treatment twice in the emergency department for a rash, which was possibly an allergic reaction to medications (Tr. 200-03, 206-22, *see* Tr. 270-72).  His physician at New Horizon Family Health Services (New Horizons) also prescribed Zoloft (antidepressant) and recommended counseling (Tr. 267-68).

When Plaintiff presented for counseling in April 2004, a mental examination showed he was fully oriented and had good hygiene, no psychomotor agitation, an "okay" mood, a flat affect, normal speech, relevant thought processes, "pretty good" memory, "okay" concentration, normal judgment and intelligence, and no suicidal ideation.  The counselor diagnosed an adjustment disorder with mixed anxiety and depression and a GAF score of 63 (Tr. 358-63).  As of late April 2004, Plaintiff had discontinued all of his HIV medications because he thought they were causing side-effects.  The physician noted that he was anxious and a "hypochondriac," and increased his Zoloft dosage (Tr. 264-66).  Within a few weeks, Plaintiff had restarted his anti-retroviral HIV medications and his anxiety was "stable" (Tr. 263), and by June 2004, he had "made great progress toward reaching his [treatment] goals [and] reports [a decrease] in anxiety and [] is starting to [increase] coping skills

and adjust to life changes" (Tr. 358). Despite recommendations to continue treatment, he did not seek mental health treatment for two years.

On May 18, 2004, he presented to Sidharth Patel, M.D., for an evaluation in connection with his application for benefits. Plaintiff reported that he had HIV and life-long attention deficit disorder (ADD), anxiety and depression, which caused "trouble interacting with people or being in crowds," although his current antidepressant medication was somewhat helpful. He said he had not applied for Medicaid because "he would have to pay $1.00 for any prescription he might get." Dr. Patel noted that he had a normal gait, full range of motion of his joints, and normal grip. Mentally, he was alert and oriented, had a "mildly" flat and anxious mood and no abnormal speech or thought content, and that he recalled one out of three objects after five minutes, correctly named the President, and correctly spelled "world" backwards. Dr. Patel diagnosed anxiety, depression, and possible ADD, and noted that Plaintiff had difficulty "grabbing the bull by the horns, to help himself." He concluded Plaintiff "should not have difficulty with work requiring hand use. He may be able to engage in mild-to-moderately strenuous tasks involving the setting [sic], standing, walking, bending, turning, lifting or climbing. His main bar to employment seems to [be] his anxiety, depression and this may be improved with appropriate counseling. He should not have trouble managing his finances." (Tr. 228-31).

In May 2004, Seham El Ibiary, M.D., a state agency physician, reviewed the evidence, including Dr. Patel's report, and completed a physical residual functional capacity assessment. Dr. El Ibiary concluded that Plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently, and stand/walk or sit about six hours each in an eight-hour workday (Tr. 232-39). As of June and July 2004, Plaintiff was stable on his HIV medications and planning a "long trip with his friend [for

about] 4 months to visit friends in [New Jersey]" (Tr. 261-62).  When he next followed-up for HIV, in October 2004, his weight was stable and the physician continued his current medications (Tr. 260).

On April 6, 2005, several months since Plaintiff last sought any medical treatment, he presented to Brian Keith, Ph.D., for a consultative mental evaluation in connection with his application for benefits.  Regarding his activities, he reported that he got up at various times, cared for his personal needs," smoked cigarettes, watched television, ate, took his medication, read magazines, drove two to three times per week, used a broom or vacuum cleaner and cooked depending on his mood, dined out twice a week, occasionally grocery shopped by himself, got along with others "okay," and talked on the phone.  He said his partner usually prepared his meals and did his laundry, and that his mother paid his bills.  He said he last worked as a cook, but quit because it was "too hard."  On examination, he had a flat affect, normal psychomotor functioning, clear speech, adequate remote memory, coherent conversation, adequate abstract reasoning, a sufficient range of ideas, intact judgment, and average cognitive functioning.  Dr. Keith also noted that Plaintiff remembered one of three items after five minutes and was oriented to the day but not the month and otherwise appeared attentive and on task.  He diagnosed depression and anxiety and concluded by stating, "[w]hile he stated he does feel nervous around others, he did not report any specific social inhibitions, and appears to engage in some social activities.  He does appear capable of managing any funds that may be awarded to him. . . . Cognitively, he appears to be of at least average intelligence. He was able to correctly compute a basic arithmetic problem and appears to have an average range of general and factual knowledge.  He does appear somewhat depressed and anxious.  He may have some difficulty persisting and staying on task.  Again, he appears to be of

average intellectual functioning and reported he has worked in the past but quit because the work was too hard." (Tr. 284-86).

In April 2005, Lisa Varner, Ph.D., a state agency psychologist, reviewed the evidence and concluded that Plaintiff had "moderate" limitations in activities of daily living; social functioning; and concentration, persistence, or pace; and no episodes of decompensation. (Tr. 292- 306). She also completed a mental residual functional capacity assessment, finding that Plaintiff was "moderately" limited in his ability to handle detailed instructions, maintain concentration for extended periods, and interact appropriately with the general public, but was "not significantly limited" in all other areas of work-related mental functioning. (Tr. 306-09).

In August 2005, Plaintiff reported as a "new patient" at the AnMed Family Health Center feeling "okay" and did not report any symptoms except "intermittent diarrhea." Stephen Swearingen, M.D., noted that Plaintiff's HIV was "doing well" on therapy and recommended he continue his current regimen (Tr. 318-19). The following month, Plaintiff presented as a new patient to David Potts, M.D., for follow-up of his HIV. He again denied any significant complications except for "intermittent" diarrhea. Examination was unremarkable and Dr. Potts noted that he had "done very well with his anti-retroviral therapy" and was not interested in changing his medication to possibly relieve the diarrhea. (Tr. 369-70).

On November 15, 2005, Plaintiff presented to psychologist C. David Tollison, Ph.D., at the request of his attorney. Dr. Tollison noted Plaintiff was oriented, alert, responsive, and able to provide information, and that he had fluid verbalizations, low average to average intelligence, fluid verbalizations, intact associations, and basically intact thought processes, despite some anxiety. Dr. Tollison diagnosed a depressive disorder, an anxiety disorder, a possible organic mental disorder,

and a personality disorder, and concluded that Plaintiff did "not exhibit the concentration, persistence, or pace typically required in a work setting" (Tr. 321-25). He also completed forms indicating that Plaintiff had several "marked" mental limitations (Tr. 36-42).

In June 2006, two years after his last counseling session, Plaintiff restarted mental heath treatment. Examination showed that he had a flat affect, an "emotionless" mood, and poor concentration, but was oriented and had normal speech, normal judgment and intelligence, relevant thought processes, no psychomotor retardation, and no reported memory problems. The counselor diagnosed a mood disorder and assessed a GAF score of 56 (Tr. 349-51). Treatment notes from Plaintiff's visits with Dr. Potts through August 2006, continued to show he was doing "very well" on HIV therapy, without any significant complaints (Tr. 366-68). Psychiatrist Michael Manley, M.D., noted in August 2006 that Plaintiff was able to graduate high school "[i]n spite of" his longstanding mental health problems, but subsequently relied on others for support. He also noted that Plaintiff was having relationship problems and spent " pretty much all of his time . . . at home watching TV or sleeping" and had been drinking alcohol excessively. Dr. Manley further noted that Plaintiff was "quite vague and nonspecific" and somewhat "evasive" during his evaluation. He diagnosed a mood disorder with anxiety and depression and a possible personality disorder, and increased his Zoloft dosage (Tr. 353-54). In December 2006, Dr. Potts noted that Plaintiff's depression was improved and that he drank alcohol because he was "bored, and no other particular reason why he does it." Dr. Potts also noted that he was "doing well with his HIV except for a slight increase in his viral load," and recommended counseling (Tr. 365). Within three months, Dr. Potts noted that Plaintiff had stopped drinking excessively and was "doing very well" (Tr. 364).

# V. HEARING TESTIMONY

## 1. Plaintiff's Testimony Regarding His Activities

At the administrative hearing, Plaintiff testified he had lived with his partner for the past 12 years (Tr. 396). He said that his partner received Social Security Disability benefits for HIV for about the past five years (Tr. 396-97), but visited friends in New Jersey, Florida, and New York (Tr. 420). He said that he had sometimes traveled with his partner, but had not been anywhere outside Georgia or South Carolina for the past three or four years (Tr. 424-25). He said he generally stayed at his mother's house 88 miles away in Georgia when his partner was on one of his trips (Tr. 420, 423). He said he did some housework, helped prepare meals, helped with grocery shopping, enjoyed working on cars, and sometimes ate out at restaurants, but did not have any friends (Tr. 419-21, 425). He said he got a car from his grandfather and that his mother paid for the insurance (Tr. 422-23). He said he had been convicted of stalking within the last 10 years (Tr. 428-29).

## 2. Plaintiff's Testimony Regarding His Impairments

Plaintiff testified that as of January 23, 2004, his alleged onset date, he was having panic attacks and symptoms from HIV that included "[f]atigue, diarrhea, nausea, headaches, sinuses" (Tr. 405-07). He said his blood cell count had never been lower than it was at that hospital visit in January 2004, around the time he started taking antiretroviral medications (Tr. 405-06). He said he became fatigued by activities such as walking up stairs, lifting objects over "10, 20 pounds," or standing more than 30 minutes (Tr. 407). He said he could probably stand, with breaks, only four hours total in a day and lift 20 to 25 pounds occasionally (Tr. 407-08). He said his HIV was better in some ways now than in 2004 (higher cell count) and worse in other ways (muscle loss he had not reported to his doctor) (Tr. 408-09).

With regard to his mental impairments, Plaintiff said he began taking antidepressant medication (paid for by the State) about the time he "started seeing the HIV doctors," but had been treated for mental health issues "pretty much [his] whole life" (Tr. 409-10, 412, 422-23). He said he did not seek treatment for many years during high school because he did not think he had any psychiatric problems at that time (Tr. 410-11). He said his anxiety and depression became "an issue" around 1995, and that he was seeing a counselor around that time because he "had a few panic attacks"(Tr. 411). He said if he had a panic attack now it was "mild" and caused by "[b]eing around people" he did not know, and that his last panic attack lasted only about five minutes and occurred "a couple months ago" when he was at home alone (Tr. 411-12, 425-26). He said his mental impairments caused him to "lay [sic] on the couch and not want to do anything at all" and caused difficulty concentrating, paying attention, maintaining pace, remembering instructions, and getting along with others (Tr. 412, 417-18). He said he started drinking alcohol excessively around the time they increased his medication, but that he stopped in March [(2007)] (Tr. 414-16). He said he was "inclined to drink too much" when his partner went out of town (Tr. 420), and that he was more anxious when he did not drink (Tr. 416). He said he had never been hospitalized for mental impairments as an adult, and stopped getting mental health treatment because he could not afford it and did not like his counselor (Tr. 413, 430). He said his medications helped (with no side effects), and that the therapy "would've helped" (Tr. 414). He said he had tried unsuccessfully to get Medicaid (Tr. 409-10).

## 3. Plaintiff's Testimony Regarding His Past Work

Plaintiff testified that between 1997 and 2000, he worked several different jobs, but did not

"work at those places very long because it's very uncomfortable" (Tr. 397, 402-03). He said he

stopped working as a stock person at Wal-Mart, where he lifted 50 pounds or more, because "[i]t was

stressful and there were a lot of people around you and I got a little anxious" (Tr. 401). He said the

longest he ever worked was for about thirteen months, in 1994 and 1995, as a sporting goods sales

person at K-Mart (Tr. 399, 403). He said this job was "okay in the beginning, then toward the end

I was getting kind of anxious around people" (Tr. 403). He also said he did not recall exactly why

he left that job (Tr. 404). He said he quit his last job in 2000, when he moved from Georgia to South

Carolina with his partner (Tr. 397, 399), and that he did not get another job after that  because he

"had a lot of anxieties and panicky feelings being around people and the stresses of the jobs . . . I just

didn't want to get another one" (Tr. 422).


## VI.  PLAINTIFF'S SPECIFIC ARGUMENTS

**1.  The ALJ failed to apply the proper legal standards because she did not make required specific findings of fact at Step 4 about Plaintiff's mental residual functional capacity.**

Plaintiff argues that the ALJ's failure to make specific findings at Step 4 of the evaluation

process about how Plaintiff's acknowledged mental impairments affect certain specifically work-

related "domains of functioning" discussed in paragraphs "B" and "C" of Listing 12.00 constitutes

legal error requiring a remand for reconsideration of the residual functional capacity issue.

**2.  Without the required findings of fact discussed in point 1 or testimony from a Vocational Expert (VE), the ALJ's decision that Plaintiff has the residual functional capacity to return to his former work as a stock or sales clerk is not supported by substantial evidence.**

Plaintiff contends that in absence of both the arequired written findings relative to his work-

related functional domains discussed in point 1 and VE testimony addressing the actual mental or

psychological requirements of the prior jobs to which the ALJ found he could return, there is insufficient evidence in the record to support the ALJ's Step 4 finding that he is not disabled.

## VI. ANALYSIS

**1. The ALJ's finding of facts at Step 4 are sufficient as a matter of law.**

Plaintiff couches his initial point as one involving a claimed failure of the ALJ to correctly apply legal principles in his case. He contends that certain language in Social Security Ruling 96-8p – which includes, among other things, instructions about certain areas of daily and work-related functioning that must be assessed and considered by adjudicators faced with claims of psychiatric illness affecting a claimant's ability to work – requires an ALJ to make specific written findings of fact in his or her narrative opinion on each of those areas of functioning. He claims that because the ALJ in this case did not make specific findings in her narrative opinion about Plaintiff's functioning in those specific areas then her decision at Step 4 of the sequential analysis that Plaintiff can return to his past employment as a sales or stock clerk represents an improper application of legal principles and requires reversal.

The Defendant responds that the ALJ's written findings are sufficient as a matter of law because there is no requirement that the domains of functioning be specifically and explicitly written out in an ALJ's narrative opinion where such findings are implicit in the ALJ's ultimate decision that Plaintiff failed to prove that his mental impairments prevented him from performing his past employment and where that ultimate decision is adequately expressed in the narrative opinion and is supported by substantial evidence in the record.

Because independent research discloses no legal requirement of specific findings of the type Plaintiff asserts are necessary, because it is evident from her opinion as a whole that the ALJ considered and assessed all available evidence going to the issues of how and to what extent Plaintiff's anxiety and depression affects his ability to function in the relevant work-related domains referenced in Social Security Ruling 96-8p, and because the ALJ's narrative opinion is more than adequate to explain and support her ultimate Step 4 finding that Plaintiff is not disabled, the undersigned recommends that Plaintiff's first point be rejected.

**Applicable law**

As stated above, Plaintiff couches his first point as one claiming legal error by the ALJ. He claims that the ALJ applied incorrect legal standards and/or procedural rules of the Social Security Administration in connection with her Step 4 analysis in his case. The deferential standard of review applied to an ALJ's findings of fact does not apply to the ALJ's conclusions of law or the application of legal standards or procedural rules. *Wiggins v. Schweiker*, 679 F.2d 1387 (11th Cir.1982); see *Coffman v. Bowen*, 829 F .2d 514, 517 (4th Cir.1987) ("A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."). Accordingly, this issue is analyzed in this Report and Recommendation with the less-deferential standard of review in mind.

The Social Security Ruling on which Plaintiff relies for his legal error argument is titled: "POLICY INTERPRETATION RULING TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS." SSR 96-8p, 1996 WL 374184. It contains several dense, but informative, sub-parts and discusses various considerations and assessments that are to be undertaken by Social Security adjudicators in connection with decisions on a claimant's

residual functional capacity (RFC) as affected by both exertional and non-exertional limitations. Plaintiff's argument is based on one sentence in one sub-part found in the "POLICY INTERPRETATION" portion of the Ruling. Specifically, Plaintiff quotes in his brief only that portion of the Ruling that states:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. *The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.*

Pl. Br. at 9 (emphasis added). The sentence that is italicized in the quotation above is the basis for Plaintiff's contentions, however, the complete text of that sub-part reads:

> *The psychiatric review technique.* The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

SSR 96-8p. The " 'paragraph B' and 'paragraph C' criteria of the adult mental disorders listings" referenced in the Ruling are found in the text of Listing 12.00. 20 CFR Pt. 404, Subpt. P, App. 1 "Listing 12.00". These paragraphs require assessments of "abnormalities of behavior, mood, thought, memory, orientation, development, or perception, as described by an appropriate medical source" and "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of

decompensation." ("B criteria"). *Id.* The general areas of functioning commonly referred to as the B criteria are expanded upon in sub-paragraph C of the Listing ("C criteria') which states that assessments of daily living should include consideration of whether the claimant has "serious difficulty performing [the daily living functions] without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id.* The discussion of assessment of "social functioning" is expanded in the C criteria to include the claimant's "capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals . . ." as well as his or her "cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity." *Id.* Specifically regarding work settings, the C criteria includes assessment and consideration of evidence of a claimant's "interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers." *Id.* The B criteria of "concentration, persistence, and pace," is expanded upon in the C criteria and further defined as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." *Id.* The listing states that this area of functioning "can be discussed in terms of [the claimant's] ability to work at a consistent pace for acceptable periods of time and until a task is completed, and . . . to repeat sequences of action to achieve a goal or an objective." *Id.* Finally, the B criteria of "episodes of decompensation" is expanded upon in the C criteria to include "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Id.* Such episodes "may be inferred from medical records showing significant alteration in medication; or documentation of the need for

a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." *Id.*

Although Plaintiff does not refer to any other sub-part of SSR 96-8p in connection with his legal error argument, it is notable that immediately following the sub-part that he quotes and relies upon is another sub-part titled "NARRATIVE DISCUSSION REQUIREMENTS." Unlike the sub-part on "psychiatric review technique" which is the basis for Plaintiff's legal error point and which uses words not defined in terms requiring actual writing like "assess"[1] and "consider"[2] in connection with the ALJ's RFC decision, this sub-part specifically addresses what the ALJ must "discuss"[3] and "explain"[4] in a narrative opinion relative to an RFC ruling. Words such as discuss, discussion, explain, and explanation used in this sub-part are more closely associated with a writing requirement than are words like assess, assessment, consider, consideration used in the sub-part on which Plaintiff relies for his contentions. *See supra* notes 1-4. The "Narrative Discussion Requirements" is where the Commissioner addresses what needs to actually be written up by an ALJ and included in the narrative opinion. For example,

---

[1]The verb "assess" is defined as to "evaluate or estimate." Oxford University Press, *Oxford Concise Dictionary* (11th ed. rev. 2008).

[2] The verb "consider" is defined as to "think carefully about, . . . believe or think, . . . take into account when making a judgement, . . . look attentively at." *Id.*

[3] The verb "discuss" is defined as to "talk about so as to reach a decision" and to "talk or write about (a topic) in detail."

[4]The verb "explain" is defined as to "make clear by giving a detailed description, . . . give a reason or justification for, . . . excuse or justify one's motives or conduct."

[t] he RFC assessment must include a narrative *discussion* describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must *discuss* the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also *explain* how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184 (emphasis added)(footnote omitted).

The Ruling also requires specific discussion of (*i.e.*, writing about) credibility determinations made in connection with testimony about the nature and extent of a claimant's symptoms and/or pain and their affect on RFC as well as decisions relating to the weight given to relevant medical reports.[5]

---

[5]     Symptoms. In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:

* Contain a thorough *discussion* and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;
* Include a resolution of any inconsistencies in the evidence as a whole; and
* Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

The RFC assessment must include a *discussion* of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. In instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints *solely* on the basis of such personal observations. (For further information about RFC assessment and the evaluation of symptoms, see SSR 96-7p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an

-19-

There is nothing in this sub-part of the Ruling about any requirement that an ALJ make specific findings on the domains of functioning in his RFC analysis in mental impairment claims even though this would appear to the logical place for the Commissioner to place such a requirement.

The Defendant counters Plaintiff's contentions by citing two cases, one from the Fourth Circuit and one from the Eighth Circuit, in which the reviewing court accepted or permitted "implicit" findings on subordinate issues leading to the ultimate determination of RFC in Step 4 or 5 of the sequential analysis : *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006) and *Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003). Plaintiff claims in his Reply Brief that these cases are distinguishable because they do not involve mental-impairment claims, however, in absence of Plaintiff providing this Court with opposing case law specifically interpreting Rule 96-8p in connection with RFC determinations in mental-impairment claims, this is a distinction without a difference. Review of both the *Hines* and *Depover* opinion discloses that while neither contains extensive legal analysis of *why* the courts so found, there is certainly language in both opinions indicating the reviewing courts' willingness to accept implicit findings on subordinate issues in ALJs' narrative opinions so long as the ultimate issues of a claimant's RFC and non-disability are supported by substantial competent evidence. *Id.*

-------

Individual's Statements.").

*Medical opinions.* The RFC assessment must always consider and *address* medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p (emphasis added).

Other informative opinions from various federal courts addressing claims similar or analogous to that asserted by Plaintiff in this case and relating to the issue sufficiency of ALJ findings on various common issues in RFC assessments in Social Security claims are available also. *See, e.g.*, *Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981)(implicit findings on subordinate issues (credibility of witness statements regarding symptoms) are sufficient so long as ultimate findings of fact are supported by record as a whole); *Banks v. Astrue*, 537 F. Supp.2d 75 (D.D.C. 2008)(collecting cases; finding SSR 96-8p does not require does not require "written articulation of all seven strength demands" in a RFC assessment in an exertional limitation claim), *appeal dismissed*, NO. 08-5123, 2008 WL 3198876 (D.C. Cir. Jul 23, 2008); *Johnson v. Califano,* 434 F. Supp. 302, 308-09 (D.C. Md. 1977)(widely cited case finding only a "broad and general requirement of articulation of reasons" and that "failure to specify the rationale for a particular subordinate decision . . . " not *per se* ground for remand); *Mathes v. Astrue,* No. 1:07-cv-1004-LJM-TAB, 2008 WL 2184894, * 5 (S.D. Ind. May 21, 2008)(mental-impairment claim; no need for detailed "function by function" written analysis under SSR 96-8p where discussion of a psychological evaluation made it evident that ALJ considered those issues). *Hughes v. Apfel,* No. CIV JFM-00-2394, 2001 WL 697845 (D. Md. May 30, 2001)(no need for ALJ to make specific findings on general functions of a job where other findings made clear why it was found claimant could return to prior work as the claimant described the performance of that work).

Addressing a closely analogous inadequate-RFC findings claim based on Ruling 96-8p, the District Court for the District of Columbia found that the expansive reading of the Ruling's requirements proposed by the claimant in that case was not appropriate. In *Banks v. Astrue*, 537 F. Supp.2d at 84, the claimant alleged exertional limitations and argued that the ALJ's narrative opinion

was subject to reversal because it did not contain explicit findings about each of the seven strength functions that SSR 96-8p states must be "considered" in such cases. The claimant asserted that the ALJ was required under the Ruling to specifically include in the narrative opinion a written "function-by-function" analysis in making an RFC decision. Finding that such a detailed written analysis was not required under the Ruling, the *Banks* court stated,

> [t]he ALJ set forth a "detailed and precise" analysis of Banks' abilities and limitations, with specific reference to record evidence. This approach, of course, is appropriate since SSR 96-8p only requires *consideration* of all the factors, not *enumeration* of all the factors. (Def.'s Mem. 20.) Indeed, as our Circuit has articulated, the RFC assessment required by SSR 96-8p is: a "function-by-function" inquiry based on all of the relevant evidence of a claimant's ability to do work and must contain a "narrative discussion" identifying the evidence that supports each conclusion.
> . . . .
>
> Social Security Ruling 96-8p does not provide the specific mandate Banks would like. Although the language of SSR 96-8p requires that the ALJ's RFC assessment " *must address* ... the remaining exertional ... capacities of the individual," this does not require written articulation of all seven strength demands. This is especially true where, as here, the ALJ provided a thorough narrative discussion of Banks' limitations. The narrative discussion requirement simply requires the ALJ to explain an "individual's ability to perform sustained work activities in an ordinary work setting on a regular basis," and "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." The ALJ's decision here clearly meets these requirements.

(footnote omitted)(emphasis in original).

Each of the cases cited above – whether finally resulting in an affirmance or reversal of the Commissioner's decision under review – essentially held that so long as the narrative opinion is sufficiency detailed and cogent on the ultimate issues for the reviewing court to follow the ALJ's logic and reasoning and supported by substantial evidence in the record, then the lack of specific findings on more subordinate issues (such as the domains of functioning in mental impairment

claims) does not require reversal. *See Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir. 1995) (Because we can "track the ALJ's reasoning and be assured that the ALJ considered the important evidence," *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995), we believe that the ALJ has met the *minimal articulation standard*.) Some courts have expressed this minimal articulation requirement as the ALJ "connecting the dots," *Mosher v. Astrue,* 479 F. Supp.2d 1196, 1205 (D. Kan. 2007)("the ALJ 'did not connect the dots, so to speak,' between the evidence he summarized and the conclusion he reached.") (quoting *Kency v. Barnhart,* No. 03-1190-MLB, slip op. at 7 (D.Kan. Nov.16, 2004)), or building a " 'logical bridge' from the evidence to his conclusion." *Lane-Rauth v. Barnhart,* 437 F. Supp.2d 63, 67 (D.D.C. 2006) (remanding case where ALJ simply listed all the evidence without explaining which evidence led him to his conclusion or why he discounted contrary pieces of evidence). Moreover, it is widely held that ALJs are not required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision. *Phillips v. Barnhart*, 91 Fed. Appx. 775, 780 n. 7 (3d Cir. 2004)("[T]he ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)(finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision ... is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole). A recent opinion from one of our sister courts within the Fourth Circuit recognizes the line of cases holding that the ALJ is not required to specifically address each piece of evidence in the narrative opinion.

*Brewer v. Astrue*, No. 7:07-CV-24-FL, 2008 WL 4682185, *3 (E.D.N.C. Oct 21, 2008). Additionally, though not directly on point since it does not directly involve interpretation of Ruling 96-8p, an opinion from another of the district courts within the Fourth Circuit is instructive on the issue of overall sufficiency of the evidence and findings to support the ALJ's mental-impairment related RFC decision. *McPherson v. Astrue* , 605 F. Supp.2d 744 (S.D.W. Va. 2009)(discussing sufficiency of findings about weight of medical reports, claimant's credibility, and domains of function in connection with RFC determination).

No controlling Fourth Circuit precedent was cited by the parties or found in independent research holding an ALJ's Step 4 RFC findings in mental-impairment claims to the strict and expansive standard that Plaintiff would have this Court require. However, it appears that at least two district courts in California in unpublished opinions have specifically rejected similar claims based on Ruling 96-8p. *See Lopez v. Astrue,* No. C 07-2649 PJH, 2008 WL 3539623, at *7 (N.D. Cal. Aug. 12, 2008)(finding that the ALJ was under no obligation to specifically incorporate the findings from the psychiatric review technique in his ultimate assessment of plaintiff's RFC at steps four and five); *see also Langford v. Astrue,* No. CIV S-07-0366 EFB, 2008 WL 2073951, at *3-4 (E.D. Cal. May 14, 2008)(finding the same). The District of Kansas has issued at least two unpublished opinions that appear to place stringent finding requirements of the type that Plaintiff seeks in this case on ALJs considering RFC in mental-impairment claims in that district. *Sawyer v. Astrue*, No. 08-2114-KHV, 2009 WL 634666 (D. Kan. March 11, 2009) (citing SSR 96-8p as one basis for reversal for more specific findings re: functional limitations /medical support for RFC in mental impairment case where "the court is unable to follow the analysis whereby the ALJ reached his RFC assessment."); *Hilton v. Barnhart*, No. 05-1306 MLB, 2006 WL 4046076 (D. Kan. Aug. 28, 2006)(same, citing SSR 96-8p

and requiring "more detailed assessment of plaintiff's mental limitations by itemizing various functions contained in the broad categories of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace . . . ."). However, it is noted that the same court that decided *Sawyer and Hilton* – albeit in another unpublished opinion – specifically rejected a similar contention made by a different mental-impairment claimant that RFC findings were not sufficiently detailed because the ALJ did not specifically discuss each piece of evidence or include a specific written "function-by-function" analysis of certain domains of function. In *Dannels v. Astrue,* No. 07-4122-JAR, 2008 WL 4191530 (D. Kan. Sept.11, 2008), the court ruled that the claimant's contentions about the lack of specific findings were not appropriate because a requirement that every narrative opinion contain RFC findings of the specificity demanded by the claimant would, essentially, result in a clogged Social Security claims review system. The court stated that "[s]uch a rule would produce gridlock in the disability review process and would cause the Commissioner to be unable to meet his statutory duties." *Id.* at * 16.

**Application of the law to Plaintiff's claim**

The ALJ's narrative opinion in this case fully satisfies both the minimal articulation standard recognized in the case law and the requirements of Ruling 96-8p read as a whole on the ultimate Step 4 analysis issue of whether or not Plaintiff proved that he was unable to perform his past relevant work as a sales clerk or stock. *See* 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5)(claimant bears burden of proof at Step 4); *Grant v. Schweiker*, 699 F. 2d 189, 191 (4th Cir. 1983)(claimant must make *prima facie* showing of disability by showing that he or she was unable to return to past relevant work). Comparison of the words used by the Social Security Administration in the various sub-parts of Ruling 96-8p supports a finding that an ALJ is not required to specifically write about the domains

of functioning in every narrative opinion issued in mental-impairment claims. All that is required under the "psychiatric review technique" portion of the Ruling relied on by Plaintiff from his legal error argument is an "assessment" or "consideration" of the domains. By contrast, Ruling 96-8p's additional sub-part titled "NARRATIVE DISCUSSION REQUIREMENTS," uses words like "discuss" and "explain," implicating an actual requirement for writing by an ALJ, in connection with its listing of certain common RFC issues (credibility of testimony as to pain/symptoms and weight afforded competing medical reports).

In the narrative opinion issued in this case, the ALJ extensively discusses and addresses the issues of the credibility of Plaintiff's testimony as to the nature and extent of his mental impairment symptoms and limitations (Tr. 23-25) and of her rationale for rejecting the work-related functional limitation findings contained in report of Dr. Tollison. (Tr. 24). These findings are fully supported by substantial evidence. Insofar as Plaintiff's credibility is concerned, the record contains significant examples of contradictory statements made to the various medical providers and to the ALJ about the extent of his daily activities, his reasons for leaving previous employment, the extent of his use of alcohol, and his willingness to seek psychological counseling in order to minimize whatever limitations he has from anxiety and depression. (Tr. 263, 284-86, 354, 364, 358-62, 349-51, 414-17, 420). The ALJ's discrediting of Plaintiff's testimony is also supported by record evidence showing that even when he did participate in counseling/therapy, he did not attend scheduled sessions for various reasons. (Tr. 261-62, 353-54 , 413-16, 427-30). *See Mickles v. Shalala*, 29 F.3d 918, 929-30 (4th Cir. 1994)(evidence of failure to seek available treatment supports finding of no disability). Importantly, Plaintiff makes no argument that the ALJ's findings regarding his credibility are either inadequate or unsupported by substantial evidence.

The ALJ's analysis of her reasons for rejecting the findings of Dr. Tollison as to the nature and extent of Plaintiff's limitations from anxiety and depression is also supported by substantial evidence. The record supports the ALJ's finding that Tollison's report is predominately based on Plaintiff's own less-than-credible statements about the extent of his limitations and not on objective testing or less-subjective statements of knowledgeable persons other than Plaintiff. (Tr. 321-24). Additionally, his functional limitation findings are considerably more restrictive than those of any of the other physicians or psychologists who either personally evaluated Plaintiff (Tr. 228-31, 284-86, 253-54), or reviewed medical reports and records from those who did personally evaluate Plaintiff. (Tr. 232-39, 292-309 ). In other words, the record supports the ALJ's finding that Dr. Tollison's findings are contradicted by the other relevant medical records and by the record as a whole. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996)(if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight).

Implicit in the ALJ's rejection of Dr. Tollison's report is her acceptance of the functional limitation findings in the other psychologically related medical reports contained in the record, *e.g.*, the report of Dr. Seham El Ibiary, M.D. (Tr. 232-39), the reports of Drs. Patel and Keith (Tr. 228-31, 284-87), the psychiatric review technique form prepared by Dr. Varner (Tr. 288-309), and the notes of the various medical providers at the clinics where Plaintiff has discussed his alleged depression and anxiety. (Tr. 200-28). The transcript of the hearing before the ALJ also contains considerable discussion between the ALJ and claimant and the ALJ and the claimant's attorney about the Plaintiff's alleged limitations in the various relevant domains of functioning. (Tr. 399-404, 430-32). Also, the ALJ specifically discusses the various domains of functioning in her narrative opinion in

connection with her Step 3 analysis (Tr. 17-18), and thereafter states that she "also considered whether the 'paragraph C' criteria are satisfied," [and specifically found that] "the evidence fails to establish the presence of the 'paragraph C' criteria." (Tr. 18). Her explicit finding in this regard is supported by her implicit acceptance of the psychologically related medical reports other than Dr. Tollison's. It is obvious from these aspects of the record that the ALJ considered and assessed and made implicit findings regarding Plaintiff's ability to function under both the B criteria and the C criteria.

Review of the record discloses that while not all of the evaluating/consulting doctors completed the Social Security Administration's psychiatric review technique form, each of their reports address what the respective reporting medical provider believed to be Plaintiff's functioning in the various the Criteria B and C domains and discuss the nature and extent of what the reporter saw as any mental impairment and its effect on Plaintiff's ability to work. Although Dr. Tollison stated an opinion that Plaintiff's anxiety and depression caused marked difficulty for him in the social functioning and concentration, persistence, and pace domains, the other two psychologists' (Keith and Varner) reports and Dr. El Ibiary's report concluded that his mental impairments caused no more than moderate difficulty in the areas and that even these limitations could improve with treatment. Additionally, the various doctors who Plaintiff saw at clinics primarily for his medications but also for some minimal psychological therapy found his anxiety and depression to be improving and encouraged him to attend counseling, but none of them ever indicated that Plaintiff had the types of functional restrictions that Dr. Tollison did.

Under the circumstances presented in this case, where there does not appear to have been an actual "treating physician" report for Plaintiff's anxiety and depression, the ALJ was not required to

afford greater weight to any of their opinions. *See* SSR 96-2p, "Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," and SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). Nevertheless, she provided detailed analysis and record support for her decision to reject the "marked difficulty" domain opinions of Dr. Tollison and to place more weight on the reports and notes from Drs. Patel, El Ibiary, Keith, Varner, Manley, and Potts. Those findings satisfy the requirements of 20 C.F.R. § 404.1527, which requires an ALJ choosing which medical reports to credit or discredit to take into account the following factors: (1) whether the source has examined the claimant and the length and frequency of the examinations; (2) the nature and extent of relationship with a treating physician; (3) supportability; (4) consistency; (5) specialization; and (6) various other factors.

Also implicit in the ALJ's RFC finding at Step 4 that Plaintiff can still perform the full range of medium work with limitations of "superficial interactions with others and moderately complex tasks" (Tr. 19), and that he can return to his former employment as a sales or stock clerk (Tr. 25 ) is her assessment and consideration of the opinions of Drs. Patel, El Ibiary, Keith, and Varner as to Plaintiff's work-related domains of functioning. In fact, Plaintiff recognizes that Dr. Varner "actually accessed" the necessary domains in her report. Pl. Reply Br. at 9. Additionally, review of the other doctors' reports discloses considerable discussion about Plaintiff's alleged limitations in social functioning resulting from depression and anxiety and about his moderately successful performance on the various tests for concentration, persistence, pace.

Although it is true that the ALJ was required under SSR 96-8p to assess and consider all medical providers' findings relative to the various domains of function in reaching her ultimate RFC decision at Step 4, she was not required to make specific findings as to each one of the domains. Her

consideration and assessment of those issues is implicit in the limitations she specifically placed on Plaintiff's ability to do medium work such as his prior employment, and those implicit findings are acceptable in light of the detailed nature of the narrative as a whole. The ALJ's extensive explanation of the reasons for her lack-of-credibility determination regarding Plaintiff's testimony as to his alleged work-related limitations resulting from depression and anxiety and of her rationale for rejecting Dr. Tollison's findings of serious work-related limitations is sufficient to "connect the dots." This is all that is required under the applicable law discussed above, and the undersigned accordingly finds that Plaintiff's first point does not present cause for reversal.

**2. The ALJ was not required to take VE testimony at Step 4 because there is substantial evidence to support her decision without it**.

Plaintiff's second point is at least partially dependent on the outcome of his first point. He claims that without the specific findings on the work-related domains of functioning that he asserts are required under Ruling 96-8p and without additional evidence from a VE as to the actual requirements of the type of jobs the ALJ found Plaintiff could return to, the ALJ's decision that Plaintiff did not sustain his Step 4 burden of proof is not supported by substantial evidence. Defendant responds that there is substantial evidence to support the RFC decision in the case based on the ALJ's fully supported and explained discrediting of both Plaintiff's testimony and Dr. Tollison's report conclusions about the nature and extent of Plaintiff's work-related limitations from his anxiety and depression. Defendant also counters that there is no requirement of VE testimony where it is acceptable for an ALJ to rely on the claimant's own description of a past relevant job's requirements in making an RFC decision.

Under the deferential standard of review applied to sufficiency of the evidence claims, *see Richardson v. Perales*, 402 U.S. at 390-401, this point is without merit and presents no reversible

error.  As discussed above, Plaintiff fails to show reversible error on his first point; the ALJ's findings at Step 4 are legally sufficient.  Moreover, the discussion of the record as whole in connection with the analysis of the first point concludes that substantial evidence supports the ALJ's Step 4 finding that Plaintiff can perform past relevant employment even with the moderate functional limitations caused by his anxiety and depression in the area of work-related social functioning.  Finally, the controlling law in this Circuit holds that although it is acceptable for an ALJ to consult a VE for purposes of a Step 4 decision, it is not required that she do so.  The ALJ may reasonably rely on the claimant's own statements and descriptions of the exertional and non-exertional requirements of past relevant work to support the RFC decision.  20 CFR ss 404.1560(b)(2); SSR 82-62; *see also Jones v. Astrue,* No. 8:06-2765-JFA-BHH , 2008 WL 597834, * 12 (D.S.C. Feb. 28, 2008)(recognizing the superseding by subsequent Social Security regulation of former Fourth Circuit rule precluding VE testimony at Step 4).

In her narrative opinion, the ALJ recounted Plaintiff's testimony about the former jobs he held (cook, dishwasher, stock and/or sales clerk) and his allegations about the effect his alleged depression and anxiety had on his ability to maintain job performance. (Tr. 25).  Her findings that Plaintiff's past relevant work as a stock clerk required "operating a cash register and stocking merchandise on the floor" and required Plaintiff to lift "up to 50 pounds occasionally" and "10 pounds frequently" and to "stand for 8 hours . . . [with] superficial interaction with customers and co-workers" is supported by the evidence in the form of Plaintiff's on testimony about the requirements of the job (Tr. 399-404) and the report of Dr. El Ibiary, who reviewed the medical evidence  and completed a physical residual functional capacity assessment and concluded that Plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently, and stand/walk or sit about six hours each in an eight-hour workday. (Tr. 232-

39).  Therefore, under the Social Security regulations and applicable law the ALJ was not required to consult with a VE in order to support her Step 4 decision in this case because there was other substantial evidence in the record from which she could reach her RFC decision.


## VII.  CONCLUSION

Accordingly, based on the foregoing discussion and analysis it is recommended that Social Security decision under review in this case be affirmed.

Respectfully submitted,


s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 10,  2009
Florence, South Carolina


**The parties' attention is directed to the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court judge need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 2317
Florence, South Carolina 29503

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *U. S. v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).